IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:10-CV-341-FL

| | | |
|---|---|---|
| THOMAS CAFFREY and<br>EDDIE ALVAREZ | )<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | ORDER |
| FOUR OAKS BANK & TRUST<br>COMPANY, | )<br>)<br>) | |
| Defendant. | )<br>) | |

This matter comes before the court on defendant's motion for judgment on the pleadings (DE #10), which has been fully briefed. In this posture, the issues raised are ripe for review. For the reasons that follow, defendant's motion is GRANTED.

**STATEMENT OF THE CASE**

Plaintiffs Thomas Caffrey ("Caffrey") and Eddie Alvarez ("Alvarez") (together, "plaintiffs") initiated this case in the Superior Court of Wake County, North Carolina, on July 15, 2010. In their complaint, plaintiffs assert seven claims for relief: two claims for breach of contract pursuant to individual employment agreements, two claims for breach of contract pursuant to individual separation agreements, one claim of breach of the covenant of good faith and fair dealing, and two claims of violations of the North Carolina Wage and Hour Act. Plaintiffs each sought damages in excess of $10,000.00, as well as liquidated damages under the North Carolina Wage and Hour Act, attorney's fees, and costs.

Defendant Four Oaks Bank & Trust Company ("Four Oaks") removed the matter to this court on August 19, 2010. Four Oaks asserted that federal jurisdiction existed pursuant to

28 U.S.C. § 1331 inasmuch as the employment agreements are welfare benefit plans under the Employee Retirement Income Security Act ("ERISA") and that plaintiffs' claims for benefits based on those agreements are completely preempted by ERISA. Four Oaks received an extension of time to file an answer, and its answer was timely filed on September 27, 2010.

On November 23, 2010, Four Oaks filed the instant motion for judgment on the pleadings, to which plaintiff responded and Four Oaks replied.

**STATEMENT OF THE FACTS**

This case arises out of plaintiffs' employment relationship with Nuestro Banco, formerly a banking corporation organized and existing under the laws of the State of North Carolina. Plaintiffs' employment with Nuestro Banco was terminated in the weeks leading up to a corporate merger whereby Nuestro Banco was merged into Four Oaks, a corporation organized and existing under the laws of the State of North Carolina. Plaintiffs contend that they are entitled to severance benefits under employment agreements and separation agreements. Four Oaks contends plaintiffs are not entitled to severance benefits under either document.

On May 25, 2007, the organizers of Nuestro Banco extended Caffrey an offer of employment ("Caffrey Employment Agreement"). (Compl. ¶ 4, Ex. A.)[1] The Caffrey Employment Agreement offered Caffrey the position of Chief Operations Officer, Chief Financial Officer, and Executive Vice President of the proposed new bank, and included an annual compensation base of $115,000.00, and "a change of control payment equal to 299% of your base salary following a change of control and a material adverse effect on your duties or benefits with the bank" ("severance

---

[1] In evaluating a Rule 12(c) motion for judgment on the pleadings, the court may consider documents either attached to or incorporated in the complaint without converting the motion to one for summary judgment. See Farmer v. Wilson Housing Authority, 393 F.Supp.2d 384, 386 (E.D.N.C. 2004); see also Fed.R.Civ.P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

2

Case 5:10-cv-00341-FL   Document 31   Filed 06/29/11   Page 2 of 16

provision"). (Id.) Caffrey accepted the Caffrey Employment Agreement on June 1, 2007. (Id.)

On July 25, 2007, Alvarez received a substantially similar offer of employment ("Alvarez Employment Agreement").[2] (Compl. ¶ 5, Ex. B.) The Alvarez Employment Agreement offered Alvarez the position of Business Banking Loan Officer and Vice President of the new bank, provided for an annual compensation base of $85,000.00, and included a severance provision identical to Caffrey's except that it provided for a payment of 199% of the base salary. (Id.) Alvarez accepted the Alvarez Employment Agreement on July 30, 2007. (Id.)

In April 2009, an announcement was made by the management of both Nuestro Banco and Four Oaks that a merger agreement had been reached whereby Four Oaks would merge with and take control of Nuestro Banco. (Id. ¶ 10.) Although the merger had already been approved by the management of both corporations, the merger still had to be approved by the Federal Reserve, the North Carolina Banking Commission ("Commission"), the United States Federal Deposit Insurance Corporation ("FDIC"), and the shareholders of both corporations. (Id.)

Also in April 2009, Four Oaks informed both Caffrey and Alvarez that Four Oaks did not plan to retain them as employees, and that they both would be terminated upon final approval of the merger. (Id. ¶ 12-13.) Plaintiffs notified Nuestro Banco immediately of their expectation to receive severance benefits pursuant to the severance provision in the employment agreements. (Id. ¶ 14.) Nuestro Banco and Four Oaks asserted that they had no obligation to make the severance payment. (Id. ¶ 17.) Plaintiffs allege that until that point, Nuestro Banco had complied with all of the provisions set forth in the employment agreements. (Id. ¶ 18.)

---

[2] The complaint alleges that Alvarez received his offer of employment on August 6, 2007. Although the difference is not material, the court notes that the document itself is dated July 25, 2007, and Alvarez's signature is dated July 30, 2007.

To resolve the dispute, Nuestro Banco and Four Oaks negotiated with Caffrey to create a draft separation agreement ("Caffrey Separation Agreement"). (Id. ¶ 20; Ex. C.) Pursuant to the terms of the Caffrey Separation Agreement, Caffrey was to be paid $310,500.00 upon the consummation of the merger. (Id.) Nuestro Banco and Four Oaks negotiated a substantially similar draft separation agreement with Alvarez ("Alvarez Separation Agreement"), pursuant to which Alvarez was to be paid $145,500.00 upon consummation of the merger. (Id. ¶ 21; Ex. D)

The draft separation agreements, however, were never executed. The terms of the separation agreements provided that the "[e]mployee may not execute this Agreement prior to the Separation Date," which was the closing date of the merger. (Ex. C, ¶ 1, 8.) Further, the separation agreements specified that, at the time of execution, Caffrey and Alvarez had to be currently employed by Nuestro Banco. (Id., p. 1.) The separation agreements, therefore, were designed so that Caffrey and Alvarez would have to continue in their employment with Nuestro Banco until the date of the merger in order to be able to execute the separation agreements.

The Federal Reserve approval of the merger was delayed for reasons not relevant here, which ultimately delayed the merger's consummation. (Compl. ¶ 26.) During the period of the delay, on November 20, 2009, the Board of Directors of Nuestro Banco terminated Caffrey and Alvarez. (Id. ¶ 33-34.) Plaintiffs allege that Nuestro Banco and Four Oaks were aware that the Federal Reserve approval of the merger was imminent, and that the merger would be consummated shortly thereafter. (Id. ¶ 36.) Indeed, on December 8, 2009, Four Oaks announced that the Federal Reserve had approved the merger, which was finally consummated on December 31, 2009. (Id. ¶ 37, 43.) Plaintiffs allege that Nuestro Banco terminated plaintiffs specifically to avoid the execution of the separation agreements, which would have required the payment of benefits. (Id. ¶ 35.)

4

Plaintiffs allege that they immediately contacted Four Oaks and Nuestro Banco upon learning of the merger's approval, asserting that Four Oaks owed them the severance payments. (Id. ¶ 38.) Four Oaks denied liability because the separation agreements were never executed. (Id. ¶ 39.) Further, Four Oaks denied enforceability of the employment agreements. (Id. ¶ 40.)

Plaintiffs allege that Four Oaks is liable to plaintiffs for the amounts provided for in the separation agreements, or, in the alternative, for the amounts provided by the severance provision of the employment agreements. Specifically, plaintiffs' first and second claims for relief allege breach of contract pursuant to the employment agreements. Plaintiffs' third and fourth claims for relief allege breach of contract pursuant to the separation agreements. Plaintiffs' fifth claim for relief alleges a breach of the covenant of good faith and fair dealing based on Four Oaks' failure to pay benefits under the employment and separation agreements as well as on the employment relationship between plaintiffs and Four Oaks. Plaintiffs' sixth and seventh claims for relief allege violations of the North Carolina Wage and Hour Act and are based on Four Oaks' failure to pay benefits under the employment and separation agreements.

## DISCUSSION

A.    Standard of Review

Defendant has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. A motion under Rule 12(c) is governed by the same standard which governs motions to dismiss pursuant to Rule 12(b)(6). See Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). The purpose of either motion is to challenge the sufficiency of the pleadings, rather than to resolve contested facts or the merits of a claim. See Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). A claim survives such a challenge if the complaint

5

contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhanement." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). Nor will the court accept as true "unwarranted inferences, unreasonable conclusions, or arguments." Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 615 n. 26 (4th Cir. 2009).

B.  Analysis

Four Oaks has moved for judgment on the pleadings as to all of plaintiffs' claims. First, as to the claims for relief based on the employment agreements, Four Oaks asserts that the employment agreements are governed by ERISA, and that plaintiffs were not entitled to payments. To that end, Four Oaks asserts that plaintiffs' first and second claims for relief, based on breach of contract as to the employment agreements, must be dismissed with prejudice. Further, Four Oaks asserts that plaintiffs' fifth, sixth, and seventh claims for relief, which are based in part upon failure to pay benefits under the employment agreements, must similarly be dismissed with prejudice because plaintiffs are not entitled to payment under those agreements.

Four Oaks also asserts that it is entitled to judgment as to plaintiffs' claims for relief that are based on the separation agreements. The court notes, however, that federal jurisdiction in this matter was premised entirely on Four Oaks' assertion that the employment agreements are governed by ERISA. For this reason, if Four Oaks fails in its argument that the employment agreements are governed by ERISA, the court will lack subject matter jurisdiction over this matter. On the other

6

hand, if Four Oaks establishes that the employment agreements are governed by ERISA and also that it is entitled to judgment on those claims, the court may properly decline supplemental jurisdiction over plaintiff's remaining state law claims. 28 U.S.C. § 1367(c). Therefore, in the interest of efficiency, it is to the employment agreements that the court first turns.

    1.    The Employment Agreements are Governed by ERISA

ERISA does not govern all benefits provided to employees by employers, but rather applies only to "employee benefit plans." See Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 6-7 (1987); see also Lomas v. Red Storm Entertainment, Inc., 49 F.App'x. 396, 400 (4th Cir. 2002) (noting that in Fort Halifax "the Court made clear that ERISA regulates employee benefit plans, not simply employee benefits"). The term "employee benefit plan" as defined in the statute includes "employee welfare benefit plans." 29 U.S.C. § 1002(3).[3] Because the statutory definition provides little guidance in determining what constitutes a "plan" for purposes of ERISA, case law generally controls the issue. See Mullaly v. Insurance Services Office, Inc., 395 F. Supp. 2d 290, 294 (M.D.N.C. 2005) (citing Belanger v. Wyman-Gordon Co., 71 F.3d 451, 454 (1st Cir. 1995)).

In Fort Halifax, the Supreme Court established the test for determining whether an employee benefit arrangement constitutes a "plan" for purposes of ERISA, holding that a plan exists where the payment of benefits "requires an ongoing administrative program to meet the employer's obligation." Fort Halifax, 482 U.S. at 11. In applying this language, lower courts generally look to four factors to determine whether there is an "ongoing administrative scheme" and therefore an employee benefit plan governed by ERISA:

---

[3] Pursuant to the statute, an employee welfare benefit plan is "any plan, fund, or program" which is maintained by an employer for the purpose of providing: (1) medical, surgical, or hospital care or benefits; (2) benefits in the event of sickness, accident, disability, death or unemployment; (3) vacation benefits; (4) apprenticeship or other training programs; or (5) day care centers, scholarship funds, or prepaid legal services. 29 U.S.C. § 1002(1).

7

(1) the amount of managerial discretion granted in paying the benefits and whether a case-by-case review of employees is needed; (2) whether payments are triggered by a single, unique event in the course of business or on a recurring basis; (3) whether the employer must make a one-time, lump-sum payment or continuous, periodic payments; and (4) whether the employer undertook any long-term obligations with respect to the payments.

Mullaly, 395 F. Supp. 2d at 295.

The first factor, which looks to "the amount of managerial discretion granted in paying the benefits and whether a case-by-case review of employees is needed," examines the degree of discretion the employer is permitted to exercise in determining whether an employee is entitled to benefits, and is generally considered the most significant factor. See Blair v. Young Phillips Corp., 158 F. Supp. 2d 654, 659 (M.D.N.C. 2001). "The more discretion a severance agreement grants to an employer, the greater likelihood that the agreement requires an ongoing administrative scheme." Id. On the other hand, simple or mechanical determinations requiring no discretion by the employer weigh against finding an ERISA plan. See Kulinski v. Medtronic Vio-Medicus, Inc., 21 F.3d 254, 257 (8th Cir. 1994); see also Mullaly, 395 F. Supp. 2d at 295 (citing Tinoco v. Marine Chartering Co., 311 F.3d 617, 622 (5th Cir. 2002) (holding that calculating severance benefits based on age, years of employment, and salary did not require discretion)).

Here, the severance provision provides that plaintiffs were to be paid a specific sum as benefits "following a change of control and a material adverse effect on your duties or benefits." Hence, two conditions must be satisfied in order for the employee to be eligible: (1) a change of control; and (2) a material adverse effect on the employee's duties or benefits. The terms "change of control" and "material adverse effect" are not defined in the employment agreements.

On these facts, the first factor weighs in favor of finding an ongoing administrative program, because a good deal of managerial discretion is required to determine whether the employees would

8

be entitled to severance benefits. For example, the term "material adverse effect on duties or benefits" is not defined, and the term itself does not provide an easily discernible standard. Courts have repeatedly held that similar "adverse effect" provisions in severance agreements, often in combination with a change of control, required the exercise of discretion by the employer. See Collins v. Ralston Purina Co., 147 F.3d 592, 596 (7th Cir. 1998) (finding that a provision requiring employer to determine if an employee's job responsibilities were "substantially reduced" did not provide an easily discernible standard, and that such a triggering event required an ongoing administrative scheme); Bogue v. Ampex Corp., 976 F.2d 1319, 1323 (9th Cir. 1992) (finding that an agreement requiring an employer to determine whether employee's new job was "substantially equivalent" to his or her job prior to an acquisition required an ongoing administrative scheme); Fair v. Giant of Maryland, L.L.C., No. Civ.A. DKC2005-1306, 2006 WL 361338, at *8 (D.Md. Feb. 15, 2006) (noting that severance agreement required exercise of employer's discretion where employer had to decide whether the employee suffered "a diminution in position, authority, duties, or responsibilities as a result of the change in control").[4]

---

[4] Plaintiffs argue that the severance provision requires no managerial discretion, asserting that "whether there is a change in control involves no discretion," and that "no discretion is involved as to whether the plaintiffs suffered a material adverse employment effect." However, as aptly noted by Four Oaks, because the term is not defined, "the administrator must determine whether a 'material adverse effect on . . . duties or benefits with the bank' has occurred when there has been: (1) a change in position title; (2) a change in work location; (3) a change in health benefits; or (4) a change in any of the limitless functional or practical aspects of employment." (Reply at 3). Indeed, the undefined terms of the severance provision necessitate discretion and judgment on the part of the employer to determine whether the conditions are satisfied therefore entitling the plaintiffs to benefits under those provisions.

Plaintiffs rely on Lomas, in which case the severance agreement provided that plaintiff was entitled to severance benefits if he was terminated, or if he had "good reason" to end his employment within a specific time frame before and after a change of control. Lomas, 49 F.App'x. at 400. The term "good reason" was defined in the severance agreement. Id. In an unpublished opinion, the Fourth Circuit concluded that, because "good reason" was defined, the employer had "no discretion to determine . . . whether [plaintiff] was entitled to severance benefits," and therefore that no ongoing administrative scheme was required. Id. Lomas is distinguishable because, in that case, the terms were defined, whereas in this case, material terms are not defined and thus require managerial discretion. See Fair, 2006 WL 361338, at *9 (distinguishing Lomas on several grounds and noting its status as non-binding precedent).

9

The second factor weighs in favor of finding an ongoing administrative scheme as well, because the payments are not triggered by a single, unique event. In Fort Halifax, the Maine statute at issue required the payment of severance benefits in the event that an employer terminated operations at a manufacturing plant with more than 100 employees, or if operations were relocated more than 100 miles away. 482 U.S. at 5. The Supreme Court determined that the statute did not require an ongoing administrative scheme, in part because "the requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation." Id. at 12. In the event of the plant closing, meeting the statute's requirements "involves only making a single set of payments to employees at the time the plant closes." Id. Unlike the statute in Fort Halifax, which turned on a single, one-time contingency, the severance provision at issue in this case does not involve a single event. Although the change in control condition might be a single, unique event, the material adverse effect condition is not. See Collins, 147 F.3d at 595-97 (plan requiring employer to consider each manager's job responsibilities individually to determine whether those responsibilities had been reduced substantially required employer to make "nonclerical judgment calls" on multiple occasions).

Finally, the third and fourth factors admittedly weigh in favor of plaintiffs' argument that the severance provisions do not require an ongoing administrative scheme. The severance payments appear to require only a one-time, lump-sum payment without any long-term obligations by the employer with respect to the payments. Nonetheless, because the first and second factors evidence need for an ongoing administrative scheme, and because the first factor is generally considered the most significant, see Blair, 158 F.Supp.2d at 659, the court concludes that the employment

agreements require an ongoing administrative scheme, and therefore constitute employee benefit plans for purposes of ERISA. See Fort Halifax, 482 U.S. at 11.

ERISA contains a broad preemption provision, providing that, with a few exceptions, ERISA "shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a)." 29 U.S.C. § 1144(a). "A law 'relates to' an employee benefit plan . . . if it has a connection with or reference to such a plan." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983). The scope of this preemption is "deliberately expansive." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 46 (1987). Indeed, "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." Aetna Health Inc. v. Davila, 542 U.S. 200, 209 (2004).

Here, plaintiffs seek to recover benefits under the employment agreements based on various theories including breach of contract, breach of the covenant of good faith and fair dealing, and violation of the North Carolina Wage and Hour Act. A participant or beneficiary of an ERISA plan may bring a civil action to recover benefits due to him under the terms of his plan. 29 U.S.C. § 1132(a)(1)(B). When a state law claim seeks remedies for breach of an ERISA plan that are available under § 1132(a), the state law claim converts to a federal claim. See Singh v. Prudential Health Care Plan, Inc., 335 F.3d 278, 292 (4th Cir. 2003). Accordingly, plaintiffs' first and second claims for relief for breach of contract are converted to federal claims. See Darcangelo v. Verizon Communications Inc., 292 F.3d 181, 195 (4th Cir. 2002). Also, to the extent they are based on failure to pay under the employment agreements, plaintiff's fifth, sixth, and seventh claims for relief are converted to federal claims. See Holland v. Burlington Indus., Inc., 772 F.2d 1140, 1147 (4th

11

Cir. 1985); Chapman v. Health Works Med Group of West Virginia, Inc., 170 F. Supp. 2d 635, 641 (N.D.W.Va. 2001).

  2. Plaintiffs Are Not Entitled to Benefits Under the Employment Agreements

Courts are to review a denial of plan benefits under a *de novo* standard unless the plan provides to the contrary by expressly granting the plan administrator discretionary authority to determine eligibility for benefits, in which case a deferential standard of review is appropriate. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 111 (2008). Here, the employment agreements do not expressly provide for discretionary authority, therefore, the decision to deny benefits is reviewed *de novo*. When conducting *de novo* review, the court must review "the employee's claim as it would . . . any other contract claim, by looking to the terms of the plan and other manifestations of the parties' intent." Booth v. Wal-Mart Stores, Inc., 201 F.3d 335, 341 (4th Cir. 2000).

To survive defendant's motion for judgment on the pleadings, plaintiffs must have alleged sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. See Ashcroft, 129 S.Ct. at 1949. Four Oaks argues plaintiffs clearly are not entitled to relief because the plain terms of the severance provision provide for the payment of benefits "following a change of control and a material adverse effect on [plaintiffs'] duties or benefits with the bank." Because plaintiffs were terminated by Nuestro Banco before the merger took place, defendant argues there was no "change of control." (Def.'s Mem. in Supp., p. 10.) Plaintiffs argue that they clearly are entitled to relief, asserting that a "change of control" occurred when the two banks entered into the merger agreement, and that because the agreement was made before plaintiffs' termination, plaintiffs are entitled to relief. (Pl.'s Resp. in Opp.'n, p. 14.) The term "change of control" is not defined in the employment agreements; thus, the issue is whether the term is ambiguous.

12

"It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." Carolina Power & Light Co. v. Bowman, 229 N.C. 682, 693-94, 51 S.E.2d 191, 199 (1949). "[W]hen the language of a contract is clear and unambiguous, construction of the contract is a matter of law for the court." Hagler v. Hagler, 319 N.C. 287, 294, 354 S.E.2d 228, 234 (1987). The subjective understanding of a party as to the legal significance of a contract's term is immaterial to the contract's interpretation if the language is unambiguous. Mobil Oil Corp. v. Wolfe, 297 N.C. 36, 39, 252 S.E.2d 809, 811 (1979). Parol evidence may be used to determine the intent of the contracting parties if (and only if) the contract's language is ambiguous. Lattimore v. Fisher's Food Shoppe, Inc., 313 N.C. 467, 474, 329 S.E.2d 346, 350 (1985).

Whether the language of a contract is ambiguous is a question of law for the court to determine. McWhite v. ACE American Ins. Co., 412 F.App'x. 584, 587 (4th Cir. Feb. 25, 2011). A provision of a contract is ambiguous if the words or effect of the provision are uncertain or capable of several reasonable interpretations. North American Specialty Ins. Co. v. Wilder, 153 F.3d 721 (4th Cir. 1998) (table decision). In making this determination, terms are to be interpreted according to their usual, ordinary, and commonly accepted meaning." Anderson v. Allstate Inc. Co., 266 N.C. 309, 312, 145 S.E.2d 845, 848 (1966).

The term "change of control" is not defined within the employment agreements; the court therefore will give the words their usual, ordinary, and commonly accepted meaning as required. Id. "Control" as used here most naturally means "to regulate or govern," "to exercise power of influence over," or "to have a controlling interest in." Black's Law Dictionary 378 (9th ed. 2009); see also Webster's Third New International Dictionary 496 (2002) ("to exercise restraining or

13

directing influence over" or "to have power over"). To "change" most naturally means "to substitute another or others in place of" or to "remove, discard, or withdraw and replace with another." Webster's Third New International Dictionary 373 (2002).

"Change of control," therefore, given its most natural and obvious meaning, contemplates a substitution or replacement of the regulating or governing body. In the context of a corporate merger, a change of control occurs upon the merger itself, as the merging corporation generally will cease to exist and the surviving corporation becomes vested with all of the rights which each party to the merger could exercise. See Good Will Distribs. (Northern), Inc. v. Shaw, 247 N.C. 157, 159, 100 S.E.2d 334, 335 (1957); Wachovia Bank & Trust Co. v. Plumtree Sch. for Boys, 229 N.C. 738, 745, 51 S.E.2d 477, 481 (1949). Accordingly, the court concludes that the meaning of the term "change of control" is clear and unambiguous.[5]

Having determined that "change of control" unambiguously means an actual, rather than merely anticipated, change of control, the next step is to determine whether, as defendant asserts, plaintiffs were not entitled to the payment of benefits under the severance provision. As set forth more particularly in the court's summary of the facts, plaintiffs were terminated on November 20, 2009, but the merger did not take place until December 31, 2009. Accepting these facts as true and construing them in the light most favorable to plaintiffs, it is clear that plaintiffs are not entitled to relief under the severance provisions for the simple reason that plaintiffs were terminated well before any change of control took place. Plaintiffs implicitly acknowledge that no change in control

---

[5] Further, as noted above, the pleadings conclusively establish that this is the meaning that was understood by the parties. Indeed, plaintiffs allege that a change of control occurred when Four Oaks took control of Nuestro Banco through merger, thereby implicitly admitting that a change of control did not occur until the merger actually took place. (Compl. ¶ 48.) Plaintiffs cannot seriously contend that the term "change of control" means anything else.

had occurred at the time of their termination, as their termination was conducted by the Board of Directors of Nuestro Banco, not Four Oaks. Plaintiffs also assert that the change of control occurred at the time of the actual merger. (Compl. ¶ 48) Because there had been no change of control at the time of their termination, plaintiffs are not entitled to benefits under the change of control provisions.

Defendant is therefore entitled to judgment as to plaintiffs' claims based on the employment agreements. Specifically, Four Oaks is entitled to judgment on plaintiffs' first and second claims for relief, based on breach of contract for failure to pay severance benefits under the employment agreements, because plaintiffs were not entitled to benefits. By extension, therefore, Four Oaks is entitled to judgment on plaintiffs' fifth claim for relief, to the extent that it is premised on a violation of the covenant of good faith and fair dealing for failure to pay severance benefits under the employment agreements. Finally, Four Oaks is entitled to judgment on plaintiffs' sixth and seventh claims for relief, to the extent those claims are premised on violations of the North Carolina Wage and Hour Act for failure to pay severance benefits under the employment agreements. Defendant's motion is GRANTED as to those claims, which are dismissed with prejudice.

3. The court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims

As discussed previously, plaintiffs' claims based on the employment agreements were the sole basis for the exercise of jurisdiction by this court. Because the court has dismissed all claims over which it has original jurisdiction, the court in its discretion declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims. 28 U.S.C. § 1367(c)(3). Accordingly, plaintiffs' remaining state law claims are remanded to state court. See Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 617 (4th Cir. 2001) (holding a district court's power to remand pendent state

15

Case 5:10-cv-00341-FL   Document 31   Filed 06/29/11   Page 15 of 16

claims to state court is inherent in statutory authorization to decline supplemental jurisdiction under § 1367(c)).

**CONCLUSION**

For the foregoing reasons, defendant's motion for judgment on the pleadings (DE # 10) is GRANTED as to those claims that are premised on Four Oaks' failure to pay severance benefits under the employment agreements. Specifically, plaintiffs' first and second claims for relief, as well as plaintiffs' fifth, sixth, and seventh claims for relief, to the extent they relate to the employment agreements, are DISMISSED with prejudice. The court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims. The matter is accordingly REMANDED to state court.

SO ORDERED, this the 29th day of June, 2011.

LOUISE W. FLANAGAN
Chief United States District Judge